O

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES COMMODITY FUTURES TRADING COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>GORDON A. DRIVER, AXCESS AUTOMATION LLC, AND AXCESS FUND MANAGEMENT LLC,<br><br>Defendants. | Case No. 8:09-cv-00578-ODW(RZx)<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [99]** |

## I.   INTRODUCTION

The United States Commodity Futures Trading Commission ("CFTC") brings this civil enforcement action alleging that Defendant Gordon Driver (in part through his corporate vehicles Axcess Automation LLC and Axcess Fund Management LLC) operated a Ponzi scheme[1] from February 2006 through May 2009. Throughout the course of the scheme, Driver allegedly solicited at least $14.3 million from over 100 participants in the United States and Canada to participate in commodity pools to

---

[1] A "Ponzi scheme" is a "fraudulent investment scheme in which money contributed by later investors generates artificially high dividends for the original investors, whose example attracts even large investments." Black's Law Dictionary 1198 (8th ed. 2004). In ordinary operation (and as used herein), "[m]oney from the new investors is used directly to repay or pay interest to earlier investors," often with little or no revenue-producing activity other than the continual raising of new funds. *Id.*

trade commodity futures and options. Plaintiff contends that Driver sent the pool participants false and misleading reports and statements claiming profits, while in reality Driver had only two profitable trading months throughout the course of the alleged scheme. Meanwhile, Driver used only a small portion of the solicited pool funds for commodity trading, using the rest for his own personal and business expenses, including payouts to pool participants to maintain the charade.

The CFTC now moves, unopposed, for summary judgment. (ECF No. 99.) In light of Defendants' failure to oppose Plaintiff's Motion, the Court deems the matter appropriate for decision without oral argument. Fed. R. Civ. P. 78(b); L.R. 7-15. Having reviewed the evidence submitted by Plaintiffs, and having considered the applicable law, the Court **GRANTS** the CFTC's Motion. The Court finds and rules as follows.

## II.   FINDINGS OF FACT

### A.   Commodity Pool Ponzi Scheme

Between at least February 2006 and May 2009 (the "Relevant Period"), Gordon Driver solicited and accepted approximately $14,319,905 from over 100 participants in the United States and Canada to invest in a commodity pool for the purpose of trading commodity futures on or subject to the rules of a contract market. (Driver SEC Test. 25:25–26:10, Apr. 23, 2009; Santiago Decl. ¶ 9.)

In soliciting pool participants, Driver told prospective pool participants (both directly and indirectly via several "point people") that he:

- had a proprietary trading software for trading E-mini S&P 500 futures contracts that he had used to trade futures successfully (Gray Dep. 28:3–18, Dec. 7, 2011; Traynor Dep. 25:13–26:12, Jan. 13, 2012);
- obtained profitable returns averaging 1–5% per week (or 20% per month), and in some cases as high as 43% per month (*e.g.*, Driver SEC Test. 25:25–26:10, 83:16–84:12, 115:11–116:2; Slowly Decl. ¶¶ 3–6 & Exs. 1–4);

- obtained profits in seven or eight out of ten trades (Driver SEC Test. 51:1–3, 54:22–57:21);
- minimized risk by terminating trading following three losing trades in one day and imposing limits on daily losses (Mainse Test. 90:2–11, Apr. 30, 2009; Shaheen Test. 37:4–38:8, June 5, 2009).

Contrary to these representations, Driver's trading was abysmally unprofitable throughout the Relevant Period: of the $3.7 million of pool funds he traded, Driver lost approximately $3.5 million (representing a 94% loss), and he had only two profitable trading months (March and May 2009). (Santiago Decl. ¶¶ 5–7.) Driver never disclosed his losses to pool participants; instead, he sent pool participants periodic statements and reports falsely showing profitable returns averaging 5% per week (or 20% per month) and claimed that he rarely had weekly losses and never had monthly losses. (Driver SEC Test. 83:16–84:22, 115:11–116:2, 119:15–121:2, 144:1–12; Taylor Test. 99:2–16, Aug. 6, 2009.) Driver knew these representations were false, as the actual trading statements showed consistently unprofitable returns every month prior to 2009. (Driver SEC Test. 19:21–20:13; Santiago Decl. ¶ 7.) Further, Driver admits that he received the real account statements from three Futures Commission Merchant accounts held in his name, which reflected consistent losses. (Driver SEC Test. 142:8–13.)

Driver deposited pool funds in at least five bank accounts held in his name or in the name of Axcess Automation. (Driver SEC Test. 38:21–39:2, 76:24–77:16; Santiago Decl. ¶ 9.) Driver used only $3.7 million of the $14.3 million in pool funds to actually trade E-mini S&P 500 futures contracts, which he never disclosed to pool participants. (Taylor Test. 231:9–134:3, Aug. 6, 2009; Kozlowski Dep. 67:3–17, Apr. 6, 2012; Batzner Dep. 94:18–95:2, Nov. 30, 2011; Driver SEC Test. 78:10–13, 78:24–79:3; Santiago Decl. ¶ 6.) Driver used the remainder of the pool funds for personal and business expenses, including payment of $9.7 million to several pool participants as purported profits to conceal his trading losses. (Santiago Decl. ¶ 14 & Ex. II, at 6;

Driver SEC Test. 45:13–18, 87:2–10, 158:2–17, 161:12–162:8.) These purported profits were not actual profits, but rather money invested by other pool participants. Driver used an additional $1.6 million of pool funds on gambling in Las Vegas casinos, rent, meals, travel, entertainment, car payments, computer equipment, clothing, and cash withdrawals. (Santiago Decl. ¶ 14; Driver SEC Test. 45:13–18, 87:2–10, 158:2–17, 161:12–162:8.) Approximately 83 defrauded pool participants are still owed some or all of their principal, which amounts in the aggregate to $9,562,488. (Santiago Decl. ¶ 11 & Exs. II, IV.) Only $77,592 of pool funds remain and have been frozen. (Santiago Decl. ¶ 12 & Ex. IV, at 1.)

**B.     The Axcess Defendants, Failure to Register as Commodity Pool Operators, and Failure to Produce Books and Records**

Driver is the founder, owner, and sole principal of Defendants Axcess Automation LLC and Axcess Fund Management LLC, both of which are Nevada limited liability companies based in Las Vegas, Nevada. (Answer ¶¶ 18, 23, 58.) The Court finds that Driver acted within the scope of employment or office on behalf of and directly controlled the actions of both entities.

Neither Driver nor Axcess Automation have ever registered with the CFTC as Commodity Pool Operators ("CPOs"). (Answer ¶ 21.) Nevertheless, Driver and Axcess Automation, acting as CPOs, solicited, accepted, and received millions of dollars from individuals for commodity futures trading purposes and commingled pool funds with non-pool property. (Answer ¶ 24; Driver SEC Test. 72:9–11, 76:24–77:8, 77:20–22, 78:6–9; Santiago Decl. ¶ 9; Sass Dep. 136:25–138:13, Aug. 11, 2009.) In addition, Driver (acting as an employee of Axcess Automation), directly and indirectly emailed pool participants periodic reports showing profitable returns and provided pool participants with instructions on wiring funds to his bank accounts. (Driver SEC Test. 83:16–84:22, 144:1–12; Taylor Test. 72:20–73:2.)

Axcess Fund, on the other hand, has been registered with the CFTC as a CPO since July 2008, and Driver has been registered as an associated person of Axcess

Fund since September 2008. (Slowly Decl. ¶20, Ex 18; Answer ¶¶ 18, 20, 58–60.) On April 15, 2009, the CFTC sent Axcess Fund a document request under 7 U.S.C. § 6g requesting Axcess Fund's books and records. (Answer ¶ 55; Slowly Decl ¶ 19 & Ex. 17.) While Axcess Fund produced some of its records, it did not produce its emails or customer subscription agreements. (Slowly Decl. ¶¶ 24–25.) On April 28, 2008, Axcess Fund and Driver's attorney sent a letter to the CFTC stating that "Driver [would] be unable to produce true and correct records evidencing actual trading activity and corresponding financial records." (Slowly Decl. ¶ 26 & Ex. 24.) Driver asserted his Fifth Amendment right to be free from self-incrimination at his deposition when asked whether Axcess Fund had failed to timely produce documents upon a CFTC request. (Driver Dep., June 18, 2012.)

In January 2010, the Court ordered Defendants to produce all of their business records related to pool activities or risk being held in contempt of the Court's August 17, 2009 Order of Preliminary Injunction. (ECF No. 37, 41.) Defendants subsequently substantially complied with the Court's Order by producing, among other things, Axcess Fund's emails and customer subscription agreements. (ECF No. 45.)

## C.   Commingling of Commodity Pool Funds

During the Relevant Period, Driver and Axcess Automation, while acting as CPOs, commingled pool funds with non-pool property. Driver deposited solicited pool funds in bank accounts held in his own name and in the name of Axcess Automation. (Driver SEC Test. 38:21–39:2, 76:24–77:16; Santiago Decl. ¶ 9.) Axcess Automation commingled pool funds by transferring approximately $345,000 of pool funds to Driver's personal bank accounts. (Santiago Decl. ¶10.) Driver commingled pool funds by directly depositing pool participants' funds into his personal bank accounts at M&T Bank, HSBC, and Citibank Canada. (Driver SEC Test. 77:9–16, 78:6–9; Santiago Decl. ¶ 9.) Driver also deposited approximately $3.7 million of pool funds into three Futures Commission Merchant trading accounts held

in his name: York Business Associates LLC, dba Transact Futures (February 2006–May 2008); Dorman Trading LLC (May 2007–March 2009); and Advantage Futures LLC (February 2009–present.) (Driver SEC Test. 11:8–23, 13:7–16; Santiago Decl. ¶¶ 5–7.) In February 2008, Driver represented to Transact Futures that all funds in his account were entirely his own money. (Sass Dep. 11:17–24, 146:17–148:22, Ex. 12.). Also in February 2008, Driver wired $800,000 of pool funds from Axcess Automation to his account at Transact Futures. (Sass Dep. 136:25–138:13.)

Against this factual backdrop, the Court proceeds to consider the merits of the CFTC's Motion.

### III. LEGAL STANDARD

**A.    Summary Judgment Standard**

Summary judgment should be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and identify specific facts that show a genuine issue for trial. *Id.*

A genuine issue of material fact must be more than a scintilla of evidence, or evidence that is merely colorable or not significantly probative. *Addisu v. Fred Meyer*, 198 F.3d 1130, 1134 (9th Cir. 2000). A disputed fact is "material" where the resolution of that fact might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1968). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Id.* Where the moving and nonmoving parties' versions of events differ, courts are required to view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

/ / /

/ / /

B.     **Adverse Inference in Civil Cases for Fifth Amendment Claims**

The CFTC requests that the Court exercise its discretion to draw an adverse inference against Driver with regard to every matter on which Driver asserted his Fifth Amendment privilege against self-incrimination. In his deposition before the CFTC, Driver was asked many questions about the commodity pool he operated during the Relevant Period, the pool funds he had traded, the bank accounts he controlled containing pool funds, the false emails and statements he sent to pool participants, the Ponzi payments he made to some investors, and the pool funds he had misappropriated. Driver took the Fifth in response to every question. (Driver Dep., June 18, 2012.)

In civil cases, a court may, in its discretion, draw an adverse inference from a claimant's invocation of his or her Fifth Amendment right against self-incrimination. *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976). On summary judgment, however, an adverse inference alone is not enough to support the absence of a genuine dispute of material fact, and a moving party must submit further evidence in support of a summary judgment motion. *See Sec. & Exch. Comm'n v. Colello*, 139 F.3d 674, 678 (9th Cir. 1998). Because there is ample additional evidence to support the CFTC's claims on summary judgment, the Court finds it appropriate to grant the CFTC's request. The Court therefore draws an adverse inference against Driver with respect to every question to which he asserted his Fifth Amendment privilege.

### IV.     DISCUSSION

The Commodity Exchange Act (the "Act"), 7 U.S.C. § 13a-1, authorizes the CFTC to seek injunctive relief against any person whenever it appears to the CFTC that the person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of the Act or any rule, regulation, or order under the Act. The CFTC's May 14, 2009 Complaint alleged that Defendants had violated the antifraud provisions of the Commodity Exchange Act (the "Act"), failed to register as CPOs, failed to keep and produce books and records, and commingled commodity pool

funds. The Court will address each in turn, followed by a discussion of the appropriate remedies in this case.

### A.     Fraud and Misappropriation in Connection with Futures

The CFTC first contends that Defendants committed fraud and misappropriated funds in violation of section 4b the Act, 7 U.S.C. § 6b. Plaintiffs specifically allege violations of 7 U.S.C. § 6b(a)(2) for acts before June 18, 2008, and 7 U.S.C. § 6b(a)(2)(A)–(C) for acts on or after June 18, 2008.

To establish liability under either section, the CFTC must establish that Defendants made a material misrepresentation or omission with scienter. *Commodity Futures Trading Comm'n v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1328–29 (11th Cir. 2002). Proof of scienter requires evidence that a Defendant committed the alleged wrongful acts intentionally, or "that the representations were made with a reckless disregard for their truth or falsity." *U.S. Commodity Futures Trading Comm'n v. Nat'l Inv. Consultants*, No. C 05-02641 JSW, 2005 WL 2072105, at *8 (N.D. Cal. Aug. 26, 2005). A statement is material if it is substantially likely that a reasonable investor would consider the matter important in making an investment decision. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). Misrepresentations of profit and risk are material. *See R.J. Fitzgerald & Co.*, 310 F.3d at 1332–33.

The CFTC must additionally show that the fraud was (1) in connection with an order to make or the making of a contract of sale of a commodity for future delivery, and (2) made for or on behalf of another person. *U.S. Commodity Futures Trading Comm'n v.Weinberg*, 287 F. Supp. 2d 1100, 1105 (C.D. Cal. 2003), *aff'd in relevant part, vacated in part on other grounds*, *U.S. Commodity Futures Trading Comm'n v. Barrogosh*, 278 F.3d 319 (9th Cir. 2002). Actionable misrepresentations include those made to customers when soliciting their funds. *Commodity Futures Trading Comm'n v. Rosenberg*, 85 F. Supp. 2d 424, 447–48 (D.N.J. 2000); *Saxe v. E.F. Hutton & Co.*, 789 F.2d 105, 110–11 (2d Cir. 1986).

/ / /

Plaintiff has presented ample evidence of misrepresentations by all Defendants, that the misrepresentations were material, and that the misrepresentations were made with scienter. The undisputed facts show that Driver made materially false and misleading statements or omissions of facts to pool participants by falsely claiming he had been successfully trading commodity futures when in fact his trading was unsuccessful. Driver directly or indirectly sent pool participants false account statements depicting trading profits when in fact Driver had lost money trading in all but two months during the Relevant Period. Additionally, Driver only used $3.7 million of the pool's approximately $14.3 million to actually trade commodity futures, a fact he failed to disclose to investors. When investors withdrew money, Driver used funds from other investors to pay the withdrawing investors off in order to conceal and continue his fraudulent scheme. Driver's representations and omissions were false and material because they impacted the pool participants' decisions to invest, remain in the pool, or make additional investments.

The undisputed facts also reveal that Driver had control over the bank accounts where pool funds were deposited and controlled the futures trading accounts. Driver admitted that he received statements from the trading accounts. Thus, when Driver sent statements depicting profits in the pool, Driver at most knew those statements were false, or at the very least recklessly distributed those statements without regard for the truth of the statements.

Finally, "[s]oliciting or obtaining funds from investors for trading, then failing to trade the funds while using them for personal and business expenses, is misappropriation." *U.S. Commodity Futures Trading Comm'n v. Emerald Worldwide Holdings, Inc.*, No. CV03-8339AHM, 2005 WL 1130588, at *7 (C.D. Cal. Apr. 19, 2005). Misappropriation or diversion of funds entrusted to one for trading purposes is "willful and blatant fraudulent activity" that clearly violates the Act. *Weinberg*, 287 F. Supp. 2d at 1106. The undisputed facts show that Defendants only traded $3.7 million of the $14.3 million Driver obtained from pool participants. Defendants

therefore misappropriated more than $10 million from the pool to pay for expenses such as the payments to withdrawing investors, rent on Driver's residence, and Driver's other personal expenses.

For these reasons, the Court finds that Defendants committed fraud and misappropriated funds in violation of the Act. The CFTC's Motion for Summary Judgment is therefore **GRANTED** with respect to the CFTC's first claim for fraud and misappropriation.

**B.     Fraud by a CPO**

The CFTC next seeks summary judgment on its claims that Axcess Fund committed fraud as CPOs and that Driver committed fraud as Axcess Fund's "associated person" in violation of 7 U.S.C. § 6*o*(1)(A)–(B). The Court agrees.

The same intentional or reckless misappropriations, misrepresentations, and omissions of material fact violative of section 4b of the Act (as discussed above) also violate section 4*o*(1)(A)–(B) of the Act, 7 U.S.C. ¶ 6*o*(1)(A)–(B). *See U.S. Commodity Futures Trading Comm'n ex rel. Kelley v. Skorupskas*, 605 F. Supp. 923, 932 (E.D. Mich. 1985) (finding that a violation of section 4b of the Act also violated section 4*o*). The primary difference is that unlike sections 4b and 4*o*(1)(A) of the Act, section 4*o*(1)(B) has no scienter requirement. *In re Kolter*, [1994–1995 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,262 at 42,198 (CFTC Nov. 8, 1994) (citing *U.S. Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270, 284–86 (9th Cir. 1980).

The undisputed facts reveal that Defendants acted as CPOs during the Relevant Period. Axcess Fund was registered as a CPO in September 2008, and Driver was its only associated person. Therefore, these Defendants' misrepresentations and omissions of material facts and Driver's misappropriation of pool funds, as discussed above, violated not only section 4b of the Act, but also section 4*o*(1) of the Act, 7 U.S.C. § 6*o*(A)–(B). The CFTC's Motion for Summary Judgment is therefore **GRANTED** with respect to its second claim.

### C. Failure to Register as CPOs

The CFTC's third claim contends that Driver and Axcess Automation are liable under section 4m of the Act, 7 U.S.C. § 6m(1), for failure to register with the CFTC as a CPOs. Section 1a(11) defines a CPO as any person in a business in the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise who, in connection therewith, has solicited, accepted, or received funds, security, or property from others for the purpose of trading in any commodity for future delivery or subject to the rules of any contract market or derivatives transaction execution facility. 7 U.S.C. § 1a(11)(i). As described above, Driver and Axcess Automation were in a business wherein they solicited or accepted funds from others, and pooled those funds for the purpose of trading E-mini S&P 500 futures traded on the CME. Driver and Axcess Automation therefore qualify as CPOs.

Section 4m(1) of the Act requires a CPO who uses the mails or instrumentalities of interstate commerce in connection with its CPO business to register with the CFTC unless it is exempt from registration. 7 U.S.C. § 6m(1). During the Relevant Period, Driver and Axcess Automation used means of interstate commerce to receive funds from pool participants via checks and wire transfers, deposited that money into bank accounts that were pooled with other investors' funds, and used part of those funds to trade commodity futures on behalf of the pool. Driver and Axcess Automation therefore acted as unregistered CPOs in violation of section 4m(1) of the Act, 7 U.S.C. § 6m(1). Accordingly, the Court **GRANTS** the CFTC's Motion as to its third claim.

### D. Commingling of Pool Funds

The CFTC's fourth claim alleges that all Defendants commingled pool funds with non-pool property in violation of CFTC Regulation 4.20(c). CFTC Regulation 4.20(c) prohibits CPOs from commingling pool property with non-pool property. 17 C.F.R. § 4.20(c). The undisputed facts reveal that Defendants, all of whom acted as CPOs during the Relevant Period (regardless of registration status), commingled pool funds with non-pool property by transferring funds to personal bank accounts

and futures trading accounts in Driver's name. Thus, each Defendant has violated Regulation 4.20(c) by commingling pool property with non-pool property. The CFTC's Motion is therefore **GRANTED** with respect to its fourth claim.

### E. Failure by a CPO to Produce Books and Records

The CFTC contends next that Axcess Fund failed to produce books and records at the request of the CFTC in violation of the Act and CFTC Regulations.

Section 4n of the Act, 7 U.S.C. § 6n(3)(A), and CFTC Regulation 1.31(a), 17 C.F.R. § 1.31(a), require registered CPOs to maintain certain books and records and produce them to the CFTC upon request. Regulation 4.23 further provides that all registered CPOs must make and keep books and records relating to the pool and produce them to the CFTC upon request. The undisputed facts reveal that Axcess Fund, a registered CPO, failed to comply with CFTC document requests served on it by failing to timely produce its emails and subscription agreements related to the pool. Although Defendants later produced the Axcess Fund subscription agreements and related emails, they did so only upon a Court order, and not as a result of the CFTC's document request. The Court therefore finds that Axcess Fund violated section 4n of the Act, 7 U.S.C. 6n(3)(A), and CFTC Regulations 1.31(a) and 4.23, 17 C.F.R. §§ 1.31(a). The Court accordingly **GRANTS** the CFTC's Motion with respect to its fifth claim.

### F. Principal-Agent and Controlling Person Liability

The CFTC further seeks to hold Driver liable for the Axcess Defendants' violations of the Act and CFTC Regulations outlined above. The undisputed facts show that Driver was a principal of both Axcess Defendants and controlled their financial and business activities. Driver solely controlled the Axcess Defendants' bank accounts and corporate activities, and Driver was the sole source of the updates and account statements that were sent, directly or indirectly, to the pool participants. Since no other person had control over the Axcess Defendants' activities, it is reasonable to infer that Driver knowingly induced the Axcess Defendants' violations

and did not act in good faith. Accordingly, the Court finds that Driver is liable for the Axcess Defendants' violations and CFTC regulations under 7 U.S.C. §13c(b).

The undisputed facts also show that Driver was an officer or employee of the Axcess Defendants and acted within the course and scope of his employment or office when he committed the acts in violation of the ACT and CFTC regulations. Thus, the Axcess Defendants are liable for Driver's violations of the Act and CFTC Regulations under 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

## V. REMEDIES

Pursuant to the Court's finding of liability, the CFTC seeks both restitution and permanent injunctive relief to remedy Defendants' pervasive violations of the Commodity Exchange Act. The Court will **GRANT** both.

### A. Restitution

A court may order restitution under section 6c of the Act, 7 U.S.C. § 13a-1, and the Court's inherent equitable authority. *See Commodity Futures Trading Comm'n v.Co Petro Mktg. Grp., Inc.*, 680 F.2d 573, 583–84 (9th Cir. 1982) ("[W]e conclude that it would frustrate the regulatory purposes of [section 6c of] the Act to allow a violator to retain his ill-gotten gains."). While proof of investors' individual reliance typically is required to obtain restitution relief, the Ninth Circuit has held that reliance may be presumed in some enforcement cases of pervasive or widespread misrepresentation. *Cf. Fed. Trade Comm'n v. Figgie, Int'l Inc.*, 994 F.2d 595, 605 (9th Cir. 1993) (actual reliance for restitution under section 13 of the FTC Act presumed where the FTC proved defendant made material misrepresentations, that the misrepresentations were widely disseminated, and that consumers purchased defendant's product).

The purpose of restitution is to restore the status quo and return the parties to the positions they occupied before the transactions at issue occurred. *Porter v. Warner Holding Co.*, 328 U.S. 395, 402 (1946). Thus, the amount of restitution should be calculated as the difference between what defendants obtained and the

amount customers received back, but payments to customers that exceeded their principal should not be included in this calculation. *Commodity Futures Trading Comm'n v.Capital Street Fin., LLC*, No. 3:09-cv-387-RJC-DCK, 2012 WL 79758, at * 14 (W.D.N.C. Jan. 11, 2012) (excluding customers who received overpayment from restitution calculation).

The undisputed facts indicate that Defendants solicited and obtained approximately $14,319,805 from over 100 pool participants. (Santiago Decl. ¶ 9.) Driver even admitted that he had over 100 investors and reported to them returns of 1–5% per week. (Driver SEC Test. 25:25–26:10, 83:16–84:12, 115:11–116:2.) The bank and trading records, as well as Driver's own admission, demonstrate that Defendants' fraud was pervasive. The Court therefore finds restitution appropriate.

Of the $14.3 million in fraudulently solicited funds, investors are still owed approximately $9,562,488, which is the amount the CFTC seeks in restitution from Defendants. (Santiago Decl. ¶ 11 & Exs. II, IV.) The Court finds that this amount reasonably reflects the amount necessary to restore the defrauded pool participants to the status quo ante and therefore **GRANTS** the CFTC's request for restitution in the amount of **$9,562,488**.

As the CFTC notes, the Court's May 14, 2009 statutory restraining order froze approximately $77,337 in several bank accounts and one futures trading account. The Court orders that these frozen funds be applied to partially satisfy Defendants' restitution obligation.

**B. Injunctive Relief**

The CFTC additionally seeks permanent injunctive relief against Defendants under section 6c(a) of the Act, 7 U.S.C. §13a-1, to prohibit future violations of the Act and CFTC Regulations. The CFTC is entitled to a permanent injunction upon a showing that a violation has occurred and is likely to continue unless enjoined. *See United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953); *Commodity Futures Trading Comm'n v. Co Petro Mktg. Grp., Inc.*, 502 F. Supp. 806, 818 (C.D. Cal.

1980), *aff'd*, 680 F.2d 573 (9th Cir. 1982).  Determining the likelihood of future violations may involve consideration of past unlawful conduct.  *Co Petro Mktg. Grp., Inc.*, 502 F. Supp. at 818.  In drawing such an inference from past violations, "the Court should look at the totality of the circumstances, and factors suggesting that the infraction might not have been an isolated occurrence are always relevant." *Id.* (internal quotation marks omitted).  In addition, "[w]hen the violation has been predicated upon systematic wrongdoing, rather than an isolated occurrence, a court should be more willing to enjoin future conduct." *Id.*

To obtain a permanent injunction, the CFTC "need not establish irreparable harm or inadequate remedy at law, as would a private litigant." *Cf. SEC v. Interlink Data Network of L.A., Inc.*, No. 93-3073 R, 1993 WL 603274, at *11 (C.D. Cal. Nov. 15, 1993) (internal quotation marks omitted) (citing *Sec. & Exch. Comm'n v. Caterinicchia*, 613 F.2d 102, 105 n.3 (5th Cir. 1980)).  Factors the Court may consider in determining whether permanent injunctive relief is appropriate include the egregiousness of the defendant's actions, whether the violation was isolated or recurrent, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of his conduct's wrongfulness, and the likelihood that the defendant's occupation will present opportunities for future violations.  *Cf. Sec. & Exch. Comm'n v. Ginsburg*, 362 F.3d 1292, 1304 (11th Cir. 2004).

As discussed above, Defendants defrauded over 100 pool participants and obtained over $14.3 million in pool participants' funds.  Defendants misrepresented Driver's personal trading track record and falsely reported profits averaging up to 20% per month.  Defendants failed to disclose that Driver traded only $3.7 million of the pool funds, lost nearly all of it, and never had a profitable trading month save for March and May 2009.  Driver used at least $1.6 million to pay for personal expenses.  In all, Defendants misappropriated at least $10.6 million and used it for investor redemptions to conceal their fraud and for Driver's personal and business expenses.

In addition, Driver continues to engage in commodity-futures-related activities—in contempt of the Court's August 17, 2009 Order of Preliminary Injunction and for which he faces a criminal contempt hearing on July 10, 2012 (ECF Nos. 95, 121)—by soliciting customers to buy his futures trading software and advising them on their futures trading. (Rogers Decl. ¶¶ 2, 7.) This demonstrates that Driver remains harmful to the commodity futures markets.

Defendants' past fraudulent misconduct and Driver's ongoing and contemptuous business activities in the futures market in violation of a prior preliminary injunction make it highly likely that Defendants will commit future violations of the Act and CFTC Regulations unless permanently enjoined. Moreover, Driver has demonstrated no remorse for his actions or the victims' losses, and he continues to insist that he was a successful and profitable futures trader despite all evidence to the contrary. Accordingly, the Court **GRANTS** the CFTC's request for a permanent injunction, trading ban, and registration ban against all Defendants, consistent with the language contained in the CFTC's Proposed Statement of Decision filed concurrently with its Motion.

**C.    Civil Monetary Penalty**

Finally, section 6c of the Act, 7 U.S.C. § 13a-1(d)(1), together with CFTC Regulation 143.8(2)(ii)–(iii), 17 C.F.R. § 143.8(2)(ii)–(iii), permit civil monetary penalties of up to the greater of $130,000 per violation for acts before October 23, 2008, and $140,000 per violation for acts on or after October 23, 2008, or triple a defendant's monetary gain. The CFTC seeks a civil monetary penalty of $31.8 million, or triple the Defendants' monetary gain.

The CFTC's Complaint alleges each act of fraud or wrongdoing as separate violations. Courts and the CFTC have found that a high civil monetary penalty is warranted where customers have been defrauded of a substantial amount of money. *See JCC, Inc. v. Commodity Futures Trading Comm'n*, 63 F.3d 1557, 1571 (11th Cir. 1995) ("Conduct that violates core provisions of the Act's regulatory system—such as

*. . . defrauding customers should be considered very serious . . . .*" (quoting *In re Premex, Inc.*, [1987–1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,165 at 34,890–91 (CFTC Feb. 17, 1988))). The CFTC has stated that civil monetary penalties "signify the importance of particular provisions of the Act and the Commission's rules, and act to vindicate these provisions in individual cases"— especially where the defendant has intentionally violated the Act or the Commission's rules. *In re GNP Commodities, Inc.*, [1990–1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 25,360 at 39,222 (CFTC Aug. 11, 1992). "Civil monetary penalties are also exemplary; they remind both the recipient of the penalty and other persons subject to the Act that noncompliance carries a cost." *Id.*

Of the $14.3 million fraudulently solicited by Defendants, Defendants only used $3.7 million to trade futures, using the remaining $10.6 million for Ponzi redemptions and personal expenses. The CFTC seeks a civil monetary penalty of $31.8 million, which is three times $10.6 million. Because the Court finds that a penalty of three times Defendants' gains would be greater than $130,000 or $140,000 per violation, *see* 7 U.S.C. § 13a-1(d)(1); 17 C.F.R. § 143.8(2)(ii)–(iii), the Court deems $31.8 million to be an appropriate civil monetary penalty in this case under section 6 of the Act and CFTC Regulation 143.8(2)(ii)–(iii). The Court therefore **GRANTS** the CFTC's request Defendants pay a civil monetary penalty of **$31.8 million** for their violations of the Commodities Exchange Act and CFTC Regulations.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

## VI. CONCLUSION

For the reasons discussed above, Defendants' Motion is **GRANTED**. All pretrial and trial dates contained in the Court's June 8, 2012 Order granting the CFTC's ex parte application are hereby **VACATED**. The CFTC shall submit a proposed judgment consistent with this order in electronic format no later than Thursday, July 12, 2012.

**IT IS SO ORDERED.**

July 5, 2012

_____

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**